| | | |
|---|---|---|
| **ANTHONY RUSSO** | * | BEFORE THE |
| 32794 Dionis Drive | | |
| Lewes, Delaware 19958 | * | UNITED STATES |
| | | |
| and | * | DISTRICT COURT FOR THE |
| | | |
| **JEANETTE LOPEZ RUSSO** | * | DISTRICT OF MARYLAND |
| 32794 Dionis Drive | | |
| Lewes, Delaware 19958 | * | (NORTHERN DIVISION) |
| | | |
| *Plaintiffs,* | * | |
| | | |
| v. | * | CASE NO.: |
| | | |
| **THE JOHNS HOPKINS HOSPITAL** | * | |
| 1800 Orleans St, | | |
| Baltimore, Maryland 21287 | * | |
|    Serve on Resident Agent: | | |
|    CSC-Lawyers Incorporating | * | |
|    Service Company | | |
|    7 St. Paul Street, Suite 820 | * | |
|    Baltimore, MD 21202 | | |
| | * | |
| and | | |
| | * | |
| **MOHAMAD ALLAF, M.D.** | | |
| 600 N. Wolfe Street, Suite 223 | * | |
| Baltimore, Maryland 21287 | | |
| | * | |
| and | | |
| | * | |
| **ERIC G. KATZ, M.D.** | | |
| 85 Seymour Street, Suite 416 | * | |
| Hartford, Connecticut 06106 | | |
| | * | |
| | | |
| *Defendants.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **COMPLAINT**

1

The Plaintiffs, Anthony Russo and Jeanette Lopez Russo, by and through their attorneys, Roy L. Mason, Zachary E. Howerton, and Smouse & Mason, LLC, hereby sue the Defendants, Mohamad Allaf, M.D., Eric Katz, M.D., and The Johns Hopkins Hospital and state:

## PARTIES AND JURISDICTION

1. Plaintiffs, Anthony Russo ("Mr. Russo") and his wife Jeanette Lopez Russo ("Mrs. Russo") are, and at all relevant times were, Residents of the State of Delaware, residing in Lewes, Delaware.

2. At all times relevant to this claim, Defendant The Johns Hopkins Hospital was, and remains, a Maryland corporation with its principal office located in Baltimore, Maryland. The Johns Hopkins Hospital is a medical facility that provides healthcare services, acting individually and through actual and/or apparent agents, servants, and/or employees, including Mohamad Allaf, M.D. and Eric Katz, M.D.

3. At all times relevant to this claim, Defendant Mohamad Allaf, M.D. is and was a practicing urologist, board-certified in urology, and licensed in the State of Maryland. At all times relevant hereto, Dr. Allaf practiced urology in Baltimore, Maryland.

4. At all times relevant to this claim, Defendant Eric Katz, M.D. was a urologic Fellow licensed in the State of Maryland and practicing under the direction and control of Defendants The Johns Hopkins Hospital and Mohamad Allaf, M.D.

5. Defendants The Johns Hopkins Hospital, Dr. Allaf, and Dr. Katz were at all times relevant hereto, engaged in the care and treatment of Anthony Russo, and were doing business in Baltimore City, Maryland. Each of the physicians above were, at all relevant times, the actual and apparent agents of The Johns Hopkins Hospital and acting on behalf of The Johns Hopkins Hospital.

6. At all times relevant to this claim, Defendants, The Johns Hopkins Hospital, Mohamad Allaf, M.D., and Eric Katz, M.D., individually, and acting through their agents, apparent agents, servants, and employees represented to Plaintiffs and to the general public that Mohamad Allad, M.D. and Eric Katz, M.D. possessed the knowledge, skills, and abilities of a reasonably competent urologist practicing under the same or similar circumstances as those involving Anthony Russo.

7. The amount of this claim exceeds Seventy-Five Thousand Dollars ($75,000.00).

8. The venue for this claim is proper in the United States District Court for the District of Maryland. Federal subject matter jurisdiction arises out of diversity of citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different states.

9. The venue for this claim is proper in the United States District Court for the District of Maryland, Northern Division (Baltimore) because the events giving rise to the action occurred in Baltimore City, located entirely within the geographic boundaries for the District of Maryland.

10. On July 28, 2025, the Health Care Alternative Resolution Office ordered that this case be transferred to the United States District Court or to the Circuit Court of the appropriate venue. A copy of the Order of Transfer is attached.

## FACTS COMMON TO ALL COUNTS

11. Anthony Russo was born on August 30, 1964. He is employed as a civil engineer. He works from home, but his job requires that he regularly travel to job sites across the East Coast.

12. Anthony Russo is married to Jeanette Lopez Russo. Together, they raised two daughters.

13. In September 2021, Mr. Russo had a needle biopsy of the prostate gland and was diagnosed with prostate cancer by David Gordan, M.D. ("Dr. Gordon") at the Maryland Institute of Pelvic Neuroscience. Dr. Gordan referred Mr. Russo to Mohamad Allaf, M.D. at Johns Hopkins Urology. Mr. Russo underwent a preoperative evaluation in November 2021 performed by Eric Katz, M.D., instead of Dr. Allaf to whom Mr. Russo was originally referred. Mr. Russo was told that Dr. Katz was assigned to him and therefore he was Dr. Katz's patient, along with that of Dr. Allaf and The Johns Hopkins Hospital. Mr. Russo was not told that Dr. Katz was still in training as a Fellow at The Johns Hopkins Hospital nor was he informed that Dr. Katz was not board-certified at the time of their meeting.

14. During this evaluation, Dr. Katz noted that Mr. Russo had a history of two neurological conditions, Myasthenia Gravis (a chronic autoimmune, neuromuscular disease that causes weakness in the skeletal muscles) and Dystonia (a movement disorder that causes the muscles to contract involuntarily). Dr. Katz acknowledged that both conditions were considered controlled at the time of the preoperative evaluation. Dr. Katz informed Mr. Russo that he would undergo a robotic-assisted radical prostatectomy ("RARP") using the DaVinci Xi to address his cancer. Dr. Katz did not tell Mr. Russo that he would be performing the surgery rather than Dr. Allaf. Dr. Katz also did not inform Mr. Russo that he was a "Fellow" and therefore did not have the same experience and training as Dr. Allaf.

15. No physician or health care provider at The Johns Hopkins Hospital received informed consent from Mr. Russo. He was never informed, for example, that his obturator nerve could be injured during the procedure and that he could lose the use of one or both of his legs during the surgery. Had he been so informed, he would not have agreed to the RARP procedure.

16. On February 15, 2022, Mr. Russo underwent a RARP. According to the hospital records, the primary surgeon was Mohamad Allaf, M.D., whom Mr. Russo he had never met. Dr. Katz, who was a surgical Fellow at the time and was not board-certified, assisted. In addition, a Resident, Dr. Yasin Bhanji, assisted with the surgery. The surgery took approximately four-and-a-half hours. Mr. Russo was then transferred to the next level of care. Upon information and belief, during the surgery at least one of the Defendants named herein violated the standard of care either by injuring the obturator nerve themselves or by failing to properly supervise either Dr. Katz or the resident, Dr. Bhanji and severely injured Mr. Russo's obturator nerve.

17. Immediately following the surgery, Mr. Russo reported feeling left leg weakness and pelvic pain. He was unable to move his left leg inward, and his left leg repeatedly and uncontrollably fell off the hospital bed. Each time this occurred a nurse would come in and physically reposition his leg on the bed. He could not do so himself. This problem with his left leg did not exist before the surgery. Any trained physician should have realized, as required by the standard of care, that an error occurred during the surgery which was causing a major problem with his left leg. Unfortunately for Mr. Russo, neither Dr. Allaf nor Dr. Katz did.

18. Despite these complaints and problems, Mr. Russo was still not seen or evaluated by the attending physician who was supervising the actions of Dr. Katz, Dr. Allaf. Instead, he was evaluated by the less experienced trainee, Dr. Katz, who was "perplexed" by the severe leg weakness and Mr. Russo's inability to lift his leg.

19. Although Dr. Katz certainly realized that Mr. Russo's condition was likely the result of surgical error, he attributed Mr. Russo's leg discomfort to "stressors" involved in the surgery increasing the "dystonia" in his legs.

20. Neither Dr. Allaf nor Dr. Katz ever provided a plausible explanation to Mr. Russo for how this injury could have occurred other than during the surgery. Indeed, Dr. Katz denied that any actual nerve damage resulted from the surgery despite the obvious signs and symptoms immediately thereafter. Mr. Russo was told that no injury occurred during the surgery. Dr. Katz performed no testing and did not order a consultation by one of the world-class nerve experts available at The Johns Hopkins Hospital.

21. Dr. Katz did not ask for a nerve specialist consultation because he knew that a nerve specialist at The Johns Hopkins Hospital would likely diagnose a nerve injury that occurred during the surgery. Instead, although Mr. Russo reported weakness that affected his ability to walk safely, Dr. Katz ordered a physical therapy consultation only after Mr. Russo insisted that he needed assistance to walk. Dr. Katz knew when he ordered physical therapy that it would be painful for the patient and would not adequately address his condition.

22. Mr. Russo was discharged from the hospital the day after his surgery. A physical therapist noted that he required modified assistance to get out of bed and walk even the short distance required for discharge. A rolling walker was ordered and home physical therapy arranged to assist with his "rehabilitation." His attending physician, Dr. Allaf, did not bother to see him or call him. The purpose of this physical therapy was strength progression, balance training, fall prevention, and gait training – none of which are usual post-operative rehabilitation after a prostatectomy. Moreover, none of these activities would treat his nerve injury. Indeed, these activities only added to his pain and disability.

23. Upon returning home, Mr. Russo continued to experience severe leg weakness and stiffness, pelvic pain, and leg discomfort. During his home physical therapy sessions, the physical therapist noticed no improvement in his condition and referred Mr. Russo to a neuro-muscular specialist.

24. Mr. Russo then met with neurologist, Sandeep Devarapalli, M.D., at Christiana Care in Delaware. Dr. Devarapalli ordered an MRI and conducted an EMG and a nerve conduction study on April 28, 2022, which revealed that there was damage to Mr. Russo's obturator nerve which manifested bilaterally. This was shocking news to Mr. Russo, because Defendants never even hinted that a nerve injury occurred and a potential nerve injury was not included in any pre-operative "informed consent" discussion with any Defendant. This diagnosis was confirmation that the nerve was injured during the surgery.

25. Mr. Russo's records do not show any indication that Dr. Allaf, Dr. Katz, or any other member of Mr. Russo's surgical team at The Johns Hopkins Hospital addressed protection of the obturator nerve or engaged in any intraoperative nerve monitoring to detect injury to Mr. Russo's obturator nerve during the procedure. This was a violation of the standard of care by Dr. Allaf, Dr. Katz, and The Johns Hopkins Hospital. Worst of all, in order to mislead Mr. Russo away from the probable malpractice, Dr. Katz told Mr. Russo on February 28, 2022, that it was "incredibly unlikely" for the nerve to have been injured during the surgery which he then also noted in the medical record. This misinformation mislead Mr. Russo because he relied on the information.

26. Mr. Russo relied on Dr. Katz statements to his detriment. He was misled and did not know the truth about what happened until months later. Upon information and belief, Dr. Allaf and Dr. Katz knew that they had likely caused an injury to Mr. Russo's obturator nerve

during the procedure. Nothing was done by the Defendants to alert Mr. Russo to the actual cause of the severe injury.

27. As the attending physician, and chief of the Urology Department, Dr. Allaf had a non-delegable duty to see and evaluate Mr. Russo both preoperatively and postoperatively. Nonetheless, Dr. Allaf passed this responsibility on to his non-board-certified Fellow, Dr. Katz, and never personally saw or evaluated Mr. Russo's condition postoperatively. Lastly, Dr. Allaf did not even read the chart, because if he had, he would have known that Mr. Russo did not need physical therapy and instead needed a nerve injury evaluation, and likely, remedial surgery. Dr. Allaf, simply put, abandoned his patient and thereby violated the standard of care.

28. As a Fellow, Dr. Katz was, apparently, insufficiently trained to properly evaluate Mr. Russo before, during, or after this procedure. At no point was the supervisory role of Dr. Allaf apparent to Mr. Russo during his interactions with Dr. Katz.

29. Nerve damage, such as the type suffered by Mr. Russo, must be addressed immediately to ensure even a partial recovery. Both Dr. Allaf and Dr. Katz knew that without immediate treatment, Mr. Russo's nerve damage would likely worsen and become permanent. They also knew that physical therapy would be painful and would not resolve a nerve injury. These facts, in conjunction with Mr. Russo's symptoms and history of neurological disorders, necessitated an urgent evaluation by a nerve specialist upon the first report of weakness to determine whether Mr. Russo had suffered nerve damage during the surgery and whether the nerve could be repaired. This evaluation must be done urgently because treating a nerve injury beyond twenty-four to forty-eight hours after it has occurred has a much lower chance of success.

30. The Johns Hopkins Hospital has a particularly qualified neuroscience department, led by Director Ahmet Hoke, M.D., Ph.D., comprised of a world-renowned team of neurologists and neurosurgeons that deliver expert care to thousands of children and adults every year, including those with rare, complex conditions. The internationally recognized expertise of this department was, at all times, available to evaluate Mr. Russo after his surgery, but such a consultation was never ordered. Neither Dr. Katz nor Dr. Allaf ordered that Mr. Russo's nerve injury be investigated or documented. If Mr. Russo had been immediately referred to the nerve specialists, who were readily available at The Johns Hopkins Hospital, his nerve injury would have been promptly repaired. He would not be suffering from a permanent, disabling injury today.

31. As an attending physician, Dr. Allaf had the responsibility to personally assess Mr. Russo's condition and order an evaluation by a nerve specialist. Nonetheless, Dr. Allaf abandoned Mr. Russo after his surgery, and neither Dr. Allaf, Dr. Katz, nor any other medical professional at The Johns Hopkins Hospital, ordered the required evaluation by a neurology specialist.

32. The damage to Mr. Russo's obturator nerve has exacerbated his dystonia. As a result, he now has pronounced difficulty walking and has been prescribed additional medication to retain some mobility in his legs.

33. Mr. Russo continues to suffer from intense pain as a result of his obturator nerve damage. This pain starts in his pelvic region, extends into his hip, and settles in the back of his knee. This pain causes his knee to buckle and has resulted in numerous falls that have caused additional injuries.

34. The intense pain suffered by Mr. Russo affects his day-to-day life in devastating ways. Mr. Russo is unable to sit for long periods of time, has severe trouble sleeping, and cannot travel significant distances.

35. Mr. Russo's pain and lack of mobility also interferes with his marriage. As a result of the malpractice alleged herein, Mr. Russo's erectile dysfunction has substantially worsened. His constant excruciating pain and frequent inability to complete physical tasks has caused considerable stress in their marital relationship and has dramatically limited the activities in which they can participate as a couple.

36. Mr. Russo's intense pain and lack of mobility have become serious detriments to his career. Previously, Mr. Russo's responsibilities as a civil engineer included prolonged periods of sitting and frequent travel to job sites along the East Coast. Due to his nerve injury and the failure of treatment, he is no longer able to sit for more than a brief time and cannot comfortably travel long distances for work or pleasure. As a result, his billable hours have decreased from thirty-six hours per week to twenty-four hours per week. This reduction has substantially and permanently reduced his income.

37. The damage caused to Mr. Russo's obturator nerve by Defendants has also caused complications in other aspects of his health. On January 20, 2025, Mr. Russo required an inguinal hernia repair. This procedure can usually be done robotically, but because of the damage to his obturator nerve, Mr. Russo instead had to undergo an open procedure. This is a much more invasive operation than the robotic assisted procedure and required a significantly longer recovery time.

38. To address his pain and lack of mobility, Mr. Russo has undergone extensive medical treatment necessitated by the malpractice herein. Since his surgery he has been regularly

engaged in pelvic pool therapy, as well as traditional physical therapy, to rebuild strength in his legs. Progress has been slow. Recently his physical therapist ordered a TENS unit to control his pain and improve his condition. Mr. Russo had to begin using assistive technology, such as a cane and a specialized leg brace, to provide stability and support to safely walk. Despite these efforts, Mr. Russo has only experienced marginal improvement in his condition and mobility. His injuries are permanent and his condition will only worsen.

**COUNT I:**
**<u>MEDICAL MALPRACTICE</u>**

39. The Plaintiffs, Anthony Russo and Jeanette Lopez Russo, adopt and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

40. At all times complained of herein, Defendants Mohamad Allaf, M.D. and Eric Katz, M.D., acting as actual and/or apparent agents, servants, and/or employees of The Johns Hopkins Hospital, owed to Mr. Russo a duty to exercise reasonable skill and care in the treatment of his prostate cancer and associated conditions.

41. At all times complained of herein, Defendants Mohamad Allaf, M.D., Eric Katz, M.D., and The Johns Hopkins Hospital owed to Mr. Russo a duty to exercise reasonable care in the treatment of Mr. Russo and in the performance, or lack thereof, of any and all examinations, diagnostic testing, surgical operations, and consultations.

42. At all times complained of herein, Defendants Mohamad Allaf, M.D., Eric Katz, M.D., and The Johns Hopkins Hospital, individually and/or by and through their agents, servants, and/or employees, including the physicians, Fellows, Residents, physician's assistants, nurse practitioners, nurses, and/or other health care professionals providing medical care

to Mr. Russo violated the accepted standards of care and were negligent in their careless and dangerous failure to properly care for and treat Mr. Russo. These breaches of the standard of care include, but are not limited to, the following:

a. Failure to examine Mr. Russo preoperatively to determine the appropriate operative plan;

b. Failure to obtain his informed consent by omitting any presurgical information concerning the proximity of the surgery to the obturator nerve and the possibility that he would suffer a debilitating nerve injury that would seriously exacerbate his pre-existing condition(s);

c. Failing to follow adequate procedures to protect and guard Mr. Russo's obturator nerve during his prostatectomy;

d. Failing to conduct proper nerve monitoring procedures during Mr. Russo's radical prostatectomy to monitor for nerve damage during the surgery;

e. Failing to adequately monitor and evaluate Mr. Russo's post-operative condition;

f. Failing to disclose Mr. Russo's probable nerve injury to other medical professionals at The Johns Hopkins Hospital and request consultation with specialists at The Johns Hopkins Hospital, including, but not limited to, neurologists and neurosurgeons;

g. Failure to assess and provide a treatment plan for his postoperative nerve injury;

h. Failing to order an evaluation by a nerve specialist immediately following Mr. Russo's surgery when leg weakness was evident;

i. Failure to properly inform Mr. Russo of the possibility of nerve injury and obtain informed consent;

  j. Failure to properly supervise surgical students, including Fellow Eric Katz, M.D. and the Resident, Dr. Bhanji, during the surgery;

  k. Failure to see or examine Mr. Russo preoperatively or post-surgery;

  l. Failure to evaluate, monitor or supervise Mohamad Allaf, M.D., Eric Katz, M.D. or any other Resident or student involved in Mr. Russo's care and treatment;

  m. Were otherwise careless and negligent;

43. As a result of the negligence of the Defendants individually and/or by and through their agents, servants, and/or employees, including the physicians, Fellows, Residents, physician assistants, nurse practitioners, nurses, and/or other health care professionals, by failing to adequately and properly conduct a robotic assisted radical prostatectomy, monitor for nerve damage, sufficiently evaluate their patient postoperatively, and fail to seek guidance from a nerve specialist, Mr. Russo incurred physical, mental, emotional injuries and harm, plus economic loss.

44. The Plaintiffs further allege that all of these injuries and damages were directly and proximately caused by the negligent acts and omissions of the Defendants, individually and/or by and through their agents, servants, and/or employees, including the physicians, Fellows, Residents, physician assistants, nurse practitioners, nurses, and/or other health care professionals without any negligence or want of due care on part of the Plaintiffs.

WHEREFORE, Plaintiffs Anthony Russo and Jeanette Lopez Russo bring this claim against the Defendants seeking compensatory damages in an amount in excess of Seventy-Five-Thousand-Dollars ($75,000), together with interest and costs of the suit.

## COUNT TWO:
## MEDICAL MALPRACTICE: NEGLIGENT TRAINING AND MONITORING

45. The Plaintiffs, Anthony Russo and Jeanette Lopez Russo, adopt and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

46. At all times complained of herein, Defendant, Mohamad Allaf, M.D., acting as an actual and/or apparent agent, servant, and/or employee of The Johns Hopkins Hospital, owed to Mr. Russo a non-delegable duty to properly monitor and evaluate his condition.

47. At all times complained of herein, Defendant The Johns Hopkins Hospital, owed to Mr. Russo a duty to provide medical staff with adequate training, competence, and authority to properly provide medical treatment.

48. At all times complained of herein, Defendants Mohamad Allaf, M.D., Eric Katz, M.D., and The Johns Hopkins Hospital, individually and/or by and through their agents, servants, and/or employees, including the physicians, Fellows, Residents, physicians assistants, nurse practitioners, nurses, and/or other health care professionals providing medical care to Mr. Russo violated the accepted standards of care and were negligent in their careless failure to inform him of the risks of nerve injury, failure to properly perform the RARP procedure, failure to properly supervise and train the Fellow, Dr. Katz, and/or the Resident(s), failure to monitor Mr. Russo's condition, and failure to provide properly trained medical staff. These breaches of the standard of care include, but are not limited to, the following:

   a. Disregarding protocols which provide that the evaluation and monitoring of Mr. Russo's pre-operative and post-operative condition be conducted by his attending physician, not a student or Fellow;

    b. Entrusting the evaluation of Mr. Russo's condition to Eric Katz, M.D. a lesser-trained Fellow, who was not board-certified and lacked sufficient training to properly perform the RARP procedure, evaluate the injury to Mr. Russo's obturator nerve after the RARP, and understand the necessity for a post-surgical examination by an nerve injury specialist when the leg weakness was evident;

    c. Failing to provide adequate training and education for Fellows, Residents, and/or other physicians entrusted with evaluating and monitoring Mr. Russo's post-operative condition.

    d. Failing to properly supervise the Fellow, Eric Katz, M.D., and the Residents and/or students knowing that Fellows, Residents, and/or students do not have the proper training to perform a RARP procedure, nor did they have the experience or training to properly evaluate the postoperative condition of Mr. Russo;

    e. Were otherwise careless and negligent.

49. As a result of the negligence of the Defendants individually and/or by and through their agents, servants, and/or employees, including the physicians, Fellows, Residents, physician assistants, nurse practitioners, nurses, and/or other health care professionals, by failing to adequately and properly conduct a robotic assisted radical prostatectomy, avoid injury to the obturator nerve, monitor for nerve injury during the procedure adequately, sufficiently evaluate their patient, and failure to seek evaluation by a nerve specialist, Mr. Russo incurred permanent physical, mental, emotional injuries and harm, and economic loss.

50. The Defendants further allege that all of these injuries and damages were directly and proximately caused by the negligent acts and omissions of the Defendants, individually and/or by and through their agents, servants, and/or employees, including the physicians,

Fellows, Residents, physician assistants, nurse practitioners, nurses, and/or other health care professionals without any negligence or want of due care on the part of the Plaintiffs.

WHEREFORE, Plaintiffs Anthony Russo and Jeanette Lopez Russo bring this claim against the Defendants seeking compensatory damages in an amount in excess of Seventy-Five-Thousand-Dollars ($75,000), together with interest and costs of the suit.

## COUNT THREE: LOSS OF CONSORTIUM

51. Plaintiffs, Anthony Russo and Jeanette Lopez Russo, adopt and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

52. The Plaintiffs, Anthony Russo and Jeanette Lopez Russo, were husband and wife at the time of the occurrence referenced herein. The Plaintiffs remain married.

53. The violations of the standard of care by Defendants, as described herein, directly, and proximately caused injury to the marital relationship of the Plaintiffs, including a loss of society, affection, assistance, companionship, sexual relations, and income.

WHEREFORE, Plaintiffs Anthony Russo and Jeanette Lopez Russo bring this claim against the Defendants seeking compensatory damages in an amount in excess of Seventy-Five-Thousand-Dollars ($75,000), together with interest and costs of the suit.

Respectfully submitted,

SMOUSE & MASON, LLC

 /s/ Roy L. Mason
Roy L. Mason (00922)
Zachary E. Howerton (20688)
223 Duke of Gloucester Street
Annapolis, Maryland 21401
(t): (410) 269-6620
(f): (410) 269-1235
rlm@smouseandmason.com

zeh@smouseandmason.com

## **JURY DEMAND**

The Plaintiffs herein demand a trial by jury.

                                          Respectfully submitted,

                                          */s/ Roy L. Mason*
                                          Roy L. Mason (00922)